Would the clerk call the case, please? Thank you. Mr Neffel. Good morning. Good morning to all of you. Counsel, please the court. I'm here today on behalf of Daniel Corwell. My name is Jeffrey Neffel. Um, in this case, there are nine points of appeal because of the number of points, number of points that are on appeal. Um, it was my decision to primarily focus my argument on three main points today and rely upon the briefs for the other points. But by so doing, I certainly don't want to give the court the impression that they aren't of all, all of equal importance, just burdened by the time limitations and the tremendous amount of information that is part of this appeal. Um, so I guess I'll begin by addressing the facts. But before I begin, I'm wanting to tell the court that the issues that I'm here today to argue about are those related to enforcement of the prenuptial agreement, uh, the issue related to securing the maintenance award in this case, and as well, the last point of my initial brief, which deals with what I think should have happened in this case, um, that there should have been an unequal distribution of the assets that were determined to be marital assets. So let me jump back to the facts. How do we summarize 30 years in 15 minutes? Well, I guess I'll do the best I can, but start by telling the court that this is a late marriage of Diana and Robert Corwell. They were married, uh, in 1980, the time of the marriage, Bob was 53 and Diane was 33. Bob was an extremely successful businessman in the Sterling Rock Falls area. Diane was a real estate salesperson. Um, prior to this life, Diane was married. She had two children. Uh, she worked at times in various capacities, but ultimately after her divorce in 1977, she elected to become self-supporting and became a real estate agent. She worked for a different agency. Ultimately, she comes to work for Bob's company in January of 1980. Shortly after she began working for that company, she began a romantic relationship with Mr. Corwell. And despite his advanced age and all the other problems attendant there too, the two of them fell in love. Shortly thereafter, and later in that summer, they became engaged. By this time, as I said, Diane is also working for his company. Upon becoming engaged, they moved in together and approximately one month later, um, as I understand the facts, they were married. Prior to the time they became married. However, uh, the topic of a prenuptial agreement was raised at some point. Um, the factual, the facts regarding the same are highly contested on the one hand. Diane claims that she did not see the prenuptial agreement until roughly the day that it was signed. Bob, to the contrary. Um, I'm going to guess because of his failing memory due to his advanced age, really couldn't give us a concrete story at trial. He, at one time he said that they had started to talk about it when they became engaged in 1979, Bob was still married in 79. They didn't become engaged until 1980. Bob says he gave her the prenuptial agreement at one point back in 1979. He was prompted by counsel to remember the fact that it was 1980. Ultimately, um, it was all agreed that he gave it to her, uh, at least in Bob's viewpoint in approximately October of 1980. He says that the prenuptial agreement never left her hands until such time that it was signed in December of 1980, just a few days prior to their marriage. That's important because Diane states a very different version of the facts. She says that the prenuptial agreement was given to her virtually on the day that it was signed. She hadn't read it. She hadn't sought advice of counsel. It was presented to her. She focused on one thing and one thing only in the prenuptial agreement, a for five years. That was all she was concerned about because she thought, well, five years, given our advanced age is probably fair. I only need to be worried about it for five years. I'm not going to stress myself about the terms of the agreement. I'm not going to read it. I'm not going to pay attention to it because I know it's only going to be in effect for five years. Bob says he gave it to her in his completed form in October of 1980. Again, steadfastly maintain that it did not leave her hands until the day it was signed. Yet we find in the agreement type written provisions, which contain a date of December 5th, 1980. So if it's true, what Bob says that he gave it to her in October, that how did these type written provisions dated in December on December 5th, just a few days  later, I want the court to also recognize that throughout his testimony, Bob never really gave a concrete answer about any of the issues relative to enforceability of the prenuptial agreement. His testimony was vague at best. I think so may have been these kinds of answers were what he typically gave. Well, didn't, didn't your client say she might've tossed it. She said she might've tossed it later, but I'm talking about it at the end of the discussion. I don't know. She tossed it and he can't rule that out, you know, came over, move on to the next because if she destroyed it, then it shows her, her intent not to be robbed by it. Or, or, or she can't leave. It shows that she can't establish that he, that he destroyed it and wasn't. Well, the testimony is that he thinks it may have been destroyed also. He, in fact, I think said it may have been shredded. She says she knows it was destroyed. She threw it away at some point in time. And I think those statements by the two parties are consistent with the fact that they never intended it for it to be enforceable after five years. But I'll get into that in a second because the case law does provide that even if they originally signed it, if later they abandoned their intent to enforce it, the court can consider that in determining whether to enforce this prenuptial agreement was executed, which was executed some 30 years ago. Okay. But the, but the intent to abandon has to be mutual, right? Um, I believe so. And I think that you find evidence here, which Bob said it was shredded. Bob said he never saw it again or talked about it again, or even thought about it again, even during the period of time when they were consulting with estate planners, even during the period of time, which was approximately 10 years when they were consulting with attorneys and state planners, what was, what was the main sticking point from your standpoint about that prenup? The main sticking point in where there is a tremendous travesty in this case is the fact that the prenuptial agreement by its terms says that they get property as it's titled. In this case, the large majority of the, of the business assets remain titled in Bob's name, even though Diane was led to believe, as did the chalk work fine, that she was an owner in those businesses. And at times when they did the Remax franchise later, she in fact was an owner of the Remax franchise, which was conveniently run through FTH, Family Tailor Homes, which was Bob's business. They had cards identifying themselves as broker owners. Sure, they previously had a card that identified Diane as an associate, but her testimony was, and it was uncontradicted, but that was done at the advice of Remax. Later, they changed the cards to reflect the actual understanding they have between themselves, which was they were co-owners of this business as she thought she was a co-owner of Family Tailor Homes, and as she thought that she had, say, an input in the Corporal Family Limited Partnership, which are all entities which Bob used as was agreed to by his accountant. He exchanged money between these entities, the same as if he was exchanging money between the front pockets and back pockets of the same pair of pants. It's still the same pair of pants. He's moving money in, back, forth amongst them. Their marital money, the money from the businesses, the money from the fruit and labor of Diane's hard work and efforts. And the evidence is clear that she was the primary earner of commissions on real estate sales for a long period of time. The court will recall, however, that Bob and his accountant came up with this plan where they would repay some debt that Bob owed to one of the entities through not giving Diane a salary, but instead using her salary to retire debt. The problem with that was none of her income was reported. As a result, her old age benefits for Social Security are now gone. But she, but they enjoyed lower income tax payments during the years. It did save the company's money, according to the accountant that testified. But the important point about all that is that now, when we're at retirement age, Bob secured for himself a tremendous amount of wealth. And keeping in mind, Bob was the party who made all the decisions regarding the retirement assets, all the decisions on how to invest the assets, all the decisions on who was to get what, were made between Bob and his people. His people included the financial advisors. His people included the attorneys. His people included the accountant. Diane, in retrospect, should have paid more attention. Diane, in retrospect, shouldn't have trusted Bob, but she did. They were married. She trusted her husband. They were married for a long period of time. She is of the generation where she looks to her husband and figures that he is running this, this is fine, he would never do this, do anything harmful to me economically. He put all these retirement assets in his name, but we're going to be married. He put all these retirement assets. He made all the decisions regarding the retirement assets because that's what she trusted him to do. Little did she mean. In the meantime, she signed personal guarantees for all these businesses for tremendous amounts of money. She is told she's an officer and director. Reassured that they're the same thing as an owner. She trusted, and I think that's the theme here. She trusted to her detriment. There is a fiduciary relationship that results from a marital relationship. There is a fiduciary relationship which requires that Bob treat her fairly in their dealings, especially when considering the prenuptial agreement in this case. There is uncontradicted evidence that at no time did Diane ever receive advice from their counselors or Bob that she should be protecting her own assets because God forbid the marriage doesn't work out. Bob's going to get everything titled in his name. Well, didn't the prenup provide for a lump sum distribution of not less than $100,000 with no cap? It had no cap. It had not less than a hundred thousand dollars. But the important thing to remember is that's all fine and well. I know Diane came into this marriage with very little money. I do. But as a result of their combined efforts in running these businesses, these parties accumulated a tremendous amount of wealth. Unfortunately for Diane, Bob took that wealth and put it all into assets titled solely in his name. All right. But couldn't one argue, couldn't you argue that that could be accounted for in a lump sum distribution? It could have been. And that's one of the other points. Are you talking about an unequal distribution of the marital assets? Well, am I to understand that you're asking about? And a lump sum award that it'll all mean. Yes. And I've asked for that. We asked for it at the trial court level and on appeal, I argued that the trial court should have done that. The law, when you're dividing up what is marital, if you're going to strictly enforce the terms of the prenuptial agreement and say that anything titled in remains his name, those assets, which are marital, don't have to be divided 50 50, which did you start with that presumption. However, the statute says that, and I provide a case law to support that Bob could have been assigned 0% of those assets, taking into consideration all that happened in the marriage, taking into consideration all the wealth was put into assets, solely in his name. Those assets, which remained in both their names could have been given entirely to the judge could have awarded a lump sum cash amount that might have been required by how to sell some of that real estate title in his own name in order to make it. He absolutely could. And we think a lump sum award in this case is appropriate given Bob's advanced age, given the fact that he's a whole lot older than Diane he's of failing health. And if he passes away, then his, then the maintenance that Diane needs at this point to live her life, the maintenance that Diane deserves at this point, considering the contributions she made to the marriage would be preserved if the court were to award a lump sum maintenance. And we did ask for that and projected out numbers as well. That could have accomplished that. I don't understand the concept of a lump sum of a hundred thousand dollars without limit. Well, the prenuptial agreement says she would be guaranteed a little at a minimum of $100,000. I think it's important to note. And I want to note for the record that the retirement monies that were set aside for Bob are 30 times the amount set aside for Diane while they're married. They're in assets solely in his name. If you strictly enforce the prenuptial agreement, it results in Bob being 30 times to hit to her advantage. And that is just absolutely incredible. It's sickening to think that that would be fair. Well, with the note, my point is with the no cap on the lump sum distribution, why can't you strictly enforce the prenuptial agreement and still solve those problems? I think you can. And I, we asked the judge to do this and I think the law allows for it in an unequal distribution of the marital assets. That would be a very fair way to remedy the problem. If the court is going to strictly enforce the prenuptial agreement, they could award her all of the marital assets to equalize what was accomplished by way of the debt, by the assets they accumulated during the marriage. If you're going to strictly enforce and give Bob those things in his name, give Diane all the marital assets. That would make things more fair. And I think I'm out of time. Has there been a classification of family tailored homes as marital or non-marital? It has been declared marital. Yes. Thank you. Oh, I'm sorry, Mr. Dignitarily. I'm not used to being in the middle. Judges, counsel, let me clarify one thing. Family tailored homes is non-marital. It was found by the judge to be non-marital. I'm sorry, did I say marital? Hey, a couple of things. I think first we ought to kind of clear the air and get to the root of where we are. That three times pension is something that Bob had at the time he was divorced. That's the only thing he took out of the marriage. He kept it and kept it intact. And as a matter of fact, during the entire marriage, only $10 was put into the pension. So it's a non-marital asset that he kept and it grew. What's interesting is that counsel describes family tailored homes as being a desirable asset. Family tailored homes is insolvent. Family tailored homes had a $539,000 value, said the accountant, but $163,000 of that is what Bob owes it. Another $70,000 was debt that is very unlikely to be collected. And that left about a certain amount of money, but that amount plus another $40,000 was owed the Corwell Family Limited Partnership. Now, the Corwell Family Limited Partnership is the second asset that we see is contested. Now, that was a asset that was set up so that property actually that Bob had before the marriage and that was his non-marital property inscribed in the prenuptial agreement was placed in that. And there were certain additions to property that he had that were built during the marriage that the parties agreed go in. And that was essentially to benefit the eight children. Bob had six by the prior marriage and he adopted Diane's two children. And Bob was the managing partner who had the ability to develop and to make that grow so that after both passed away, the children would have the amounts. Diane was given a 2.8% interest in that, which she maintains that she values at about $12,500. So the family tailored home is an entity that really has diminished in value from the time when the parties were married. Now, the real property is divided up into four categories. We have the large condo, which is about $1.25 million, said the judge. Judge Jarreff valued the other parcel of real estate at about $1.4 million, where Bob lived in Sterling and that was both parties. We then have the Quad City piece of property, which was built, that had a value of $620,000. Then we have a small condo unit. Now, those are the items of major and the court said, well, what you can do in this case is, Diane, you have the option. You can either have half of those assets or you can make Bob buy them out. Now, when Bob buys them out and she keeps the Rock Island property, which is what's happened. If you look at. Bob has to then pay $510,000 or Bob has to pay $510,000 to buy her out because he's buying out of the larger properties. But what is not clear and pointed out the judge's opinion, but it's there, obviously, is that there are certain debts that Bob had in addition to the property that he received. And the debts were incurred directly as a result of the building and the acquisition of these four parcels of real estate. We have the property that was the Sterling address that's valued at $140,000. There's $140,000 that's owed the Coralville Family Limited Partnership, that's owed rather Family Tailored Homes. We have another $100,000 that was used to purchase a condo, which was sold, but the debt remains outstanding. And that went into the Florida condos. Who's owed that debt? The debt is owed, there's $240,000 that's owed the Coralville Family Limited Partnership, then Family Tailored Homes is owed approximately $163,000. The total of all the debt is $401,000. And Bob owns those? Bob is required, no, those are the joint properties, but Bob has the debt. If you remember paragraph P of the agreement, of the order rather, says that Bob is responsible for all the debt. So if we look at the $2.2 million, we see that Bob doesn't get half of that, because he actually has $400,000 worth of debt that he has to pay. Who owns the entities that own the debt that are owed? The Family Tailored Homes owes part of it, but we see they're insolvent. It goes back to the Coralville Family Limited Partnership, but Bob has a fiduciary duty to that partnership, because he has a duty to repay that what he owes. Who are the partners in that partnership? There are the eight children and Diane. And obviously two of those children... And he has an interest. Yeah, they have an interest, and that's an enforceable interest. And obviously if it was a distribution and there was no repayment, that would be income to Bob. But the bottom line is, so we look at what substantial success has been described with the Family Tailored Homes, it hasn't been. As a matter of fact, the corporation now has a negative equity, and it made little money over the last years. It's now a shell, because no one's working, no realtors are working. So we look at further... Let's take a look at the assets that Council has described are so substantial. So we have a $2.2 million. We see there's $400,000 in debt that remains unpaid. Well, there is also a $320,000 contribution that Bob made in 2009 just before Diane filed for a divorce to pay off the Quad City residence where she lives. So of that $2.2 million, $320,000 came from Bob's premarital and non-marital assets that he gets in obviously a prenuptial agreement. But that went in, and that's premarital property. So you have to look at that $2,200,000 as now about $1.4 million, and there was another $220,000 that Bob put into the condo when it was being financed. So we have almost $500,000 that was paid from Bob's non-marital property that benefited the marital property because it was put into marital property. The point is simply this. The parties lived a high lifestyle which could no longer be maintained, and when Diane was told it was no longer to be maintained, she filed for divorce. Why couldn't it be maintained? Because they were spending money on automobiles, insurance, trips, going out to dinner several times a week, taking clients out. It was an elaborate lifestyle, but it was leveraged through a business which no longer could maintain as evidenced by the fact that family-territory homes has a negative equity. Let me just answer some legal questions here. The prenuptial agreement, it seemed to me as a matter of contract, why would you agree? It's either enforceable or it's not. If there is a contract, the judge can't rewrite it, can he? I know, and Judge Darrow found there to be a contract. He found there to be, by credible evidence, that the document that was presented was the premarital agreement and that it was found to exist. The question becomes, how do you rewrite the maintenance provision? He wrote out the lump sum and put in a maintenance award, right? Well, she was to receive at least $100,000. Bob had, through various gifts to her, had $500,000 that she received in addition to the marital property. He funded a trust with $100,000. There was an IRA. There were a number of different investments. Bob actually gave to her that she had at the time of the separation. Well, but in fashioning his distribution, he came up with a maintenance award, right? Right. And what he did was he said, I look at the particular Burgess decision that was decided by the third district, and he said that generally, Illinois courts are to mitigate potential harm to spouses, which could result from strict enforcement of maintenance provisions and actual agreements. All right. But we know what he did. And your position is he can't do that, right? Well, we look at the language with which he did it, and that's where we take issue. Because the language says, this circumstance must be more than a mere change in economic fortune. Circumstances of the life. And the opinion goes on to say, an otherwise valid waiver of maintenance provision would be disregarded, for instance, if its enforcement would render the spouse a public charge. Such a condition of penury could arise because of a lack of property resources or because of a condition of unemployability. And then there are a series of cases that have been decided where if the spouse has a substantial property award, then maintenance provision will, the waiver will be allowed to exist because she's not penuring. In this situation, Diane ends up with $1 million worth of assets. She ends up with $500,000 worth of assets that she held in visually that she gets, so she ends up with $1.5 million that's hardly penurious. Based on the Burgess decision, the trial court and the trial court's written opinion on the bottom of page 9 and the top of page 10 goes into the circumstances that the judge's belief is justified under the Burgess case to deviate from the normal written contract. Well, let me suggest to you that's where the judge makes his error. He makes his error because these are really economic circumstances, change in economic fortune rather than a penurious condition. If we're going to allow... Well, he goes into a number of different things, things that were done with regard to Social Security, W-2s, the way things were paid. I mean, he goes through what would happen in these circumstances and that, when he considers those factors, that's what he considers to be the justification for deviation. And that's why I'm suggesting does not justify the deviation because these are really more economic fortune changes. For instance, and it's disproportionate, do we feel that $500 worth of Social Security and $600 worth of Social Security justifies $6,000 worth of maintenance a month when she has $1,000,005? And if she keeps her condo, which has about $600,000 in valuation, she has $1,000,000 in cash and liquidity, whereas Bob has, as a result of the marriage, $400,000 worth of debt to pay and he has almost $500,000 that he's taken from his non-marital assets and put in. So the bottom line is she is hardly penurious. She has $1,000,000 worth of cash and liquidity because Bob has bought her out and she kept the one property, which is the Quad Cities, and that doesn't render her penurious. Then we say, Diane, one of the factors he listed is the incorrect assumption regarding her financial position during the marriage. Well, the incorrect assumption was something the judge said she didn't really... It's her fault because she didn't care about the nuts and bolts of running the operation. She disregarded what was put in front of her. She really didn't care until there was a change in the $805 she was going to receive because they could no longer pay it to her because family tailored homes had absolutely no income, very little income with which to pay anything. And that generated the divorce petition. Is that the kind of penurious condition that Burgess refers to in the project? It isn't. They look at penuries. They look at the inability that the wife hasn't been provided for. She certainly hasn't been provided for here with property of the $500,000 that Bob gave her during the marriage and then the $1,000,000 she gets from the division of marital property. And I think that's really the sticking point where you get to the maintenance issue. Would you just forget the facts of this case for the sake of this question? Sure. Either the agreement is good in total as a contract or it's not. Trials courts are not supposed to rewrite contracts. That's right. And it's your position that that's what he did. Well, our position is the law in Burgess, in this circuit, is that you have to work... So it's your position that he didn't, that he enforced that contract? I think he did rewrite the law. All right, good. Thanks. So, and he took that rewriting and by awarding maintenance, I mean, that was part of basically his property award. I mean, wouldn't maintenance be considered all and part of that, wouldn't you say? Actually, maintenance is looked at and characterized a little bit differently by the courts. Well, it is, but you're still looking at property. You say how much property he has is a reflection of how much maintenance he needs and vice versa. If we're looking at the maintenance provision in the statute, yes. But there's a deviation allowed because the judge cites one decision, the head decision, and that is not, that's not a prenuptial agreement decision. It uses the maintenance provision, and the prenuptial agreement is actually an exception to the maintenance provision. That was the last two minutes. Have I answered your question, Judge? No, go ahead. So when we look at the case law, the head decision, which the judge relies upon, which is good law if you're not dealing with a prenuptial agreement, indicates that you look, it's not, you can look at the mere change in economic fortune, but... But Burgess has never been overruled. No, it hasn't been. No. And I think that's important because you have to look at whether Diane's standards fall within the exceptions that state... But Burgess didn't state that that was the only exception. It was an example. No, but I think what Burgess does, it crystallizes just how dire the position of the spouse has to be. And it's hardly, because you have cases where spouses, there's much more inequitable division of property, and we cited that in our brief, and the court said, in those cases, we're going to allow the maintenance waiver to adhere and to govern. How long were they married in Burgess? They were married... They were married in 1977, and the decision was in 1985, so it's an eight-year marriage. But we don't have the same circumstances as we have here in that there's a million dollars that the spouse had, and she has her residence paid for. That's quite a... That's hardly a penarius condition near it. And it certainly indicates in the economic... And I guess, Judge, one of the things that I think is important is, if you allow situations like this to be an exception, you're really taking away the rights of the parties to the contract. Because what you're saying is, it's not now just a dire exception that we're going to say, where spouses, in dire circumstances, we're going to say that any change in economic circumstances is enough to allow maintenance to become an exception. And that destroys the ability of contract. What's a fair lump sum maintenance waiver? Well, I don't think there's any lump sum that's fair, because when the $100,000 is spoken about, that's the minimum she gets. Diane has already received $500,000, plus half of the... By saying $100,000, that would be, say, the year afterwards, they've accumulated nothing, nothing's in Diane's name, as Bob put full $500,000 worth of assets in Diane's name. And there's no joint property. And in that case, she'd get $100,000, that would be the minimum. But the agreement provides, in the circumstances, things that are in her name are hers. The agreement also said, if it's joint property, you can trace that, in this case, the appellee indicated he wasn't going to trace, and she could have half of what was in their last... What do you think the agreement envisions as a range? I think the agreement envisions a minimum that she'd have, and then if it's over that, once she has $100,000, there's no obligation to provide a lump sum. And that's what the agreement actually says. But she is entitled to more if she owns, in this case, what she did, because Bob transferred for the trust amount of $100,000, she had an IRA, she had other things that were about $500,000 worth that he saw that she received during the... But we're talking about maintenance now, not the property. Right, we're talking about the maintenance. There's a waiver of maintenance. The agreement does not provide for a lump sum maintenance. It provides that she gets $100,000 as an award, which I'd suggest to you is a contractual... It provides that she gets not less than $100,000. Right, not less than $100,000. Something different. That could mean $5 million. Well, the less than $100,000 is in view of what the other provisions are, which says she gets to keep that which is in her name that accumulates during the marriage, and that's the $500,000. She gets half of the marital joint property where the joint property was not traced from assets that Bob had before. So I don't think it says that. It gives the court the authority to carte blanche, say. What it does, it provides the minimum she gets, and then that gets to be added to with the other properties. I didn't see a calculation formula in that phraseology, did you? No, there's no calculation. It just says that that's the minimum she gets. That's the minimum she gets. Yeah. So there's no credit set-offs? It's just sort of out there? Well, no, the joint property there is a credit or set-off that Bob could have asked for. Yeah, we could have said. I'm talking about the minimum $100,000. Oh, no, the minimum $100,000, she gets that regardless. And 30 years ago, $100,000. And even today, $100,000 is a lot of money. But obviously, with the parties and the style, it doesn't quite cover as much as it did then. Which $100,000 in 30-year-old dollars? Well, I don't know. That's a good question. I can't remember 30 years ago what I bought. Thank you. My apologies. In my nervousness, I didn't listen close enough to your question. My apologies for talking before it. I'm not used to being in this forum at the trial court level where I'm mostly at. If I make a mistake, the court wants to know immediately, so my apologies. I find it very interesting that despite the fact that the vast majority of their wealth was earned post the time that they were married and all the investments into Bob's retirement accounts that were made post after the time they were married and the amounts that Bob puts into Diane's. Bob was a nice guy. He gave Diane some money. He put some money into her account. He's a great guy because he put aside some money, but he put aside 30 times more for him. Whose great, whose not great is not a factor for us to consider. Well, I'm only referencing it from the standpoint that he's trying to say that she was fairly treated. Fairly treated? I don't think so. He put aside 30 times more for himself than her. Again, she trusted. She shouldn't have. I'm going to address you first, Justice Carter. When you ask who's owed this money, it's a very relevant question because the prospect of Bob ever having to pay back this money is nil. He hasn't ever paid any of it back. He's not going to ever pay any of it back. He's not ever going to pay himself back for this alleged debt that's encumbering these properties. The fact is this is all part of his movement of money from the front pocket to the back pocket to the side pocket. It's all his. He's never going to have to pay that money back. He's got these assets. They're free and clear. He's never going to be responsible for paying this money, period. Approximately $4-plus million of property was transferred to the CFLP during the time they were married since 1993 when it was formed. Your Honor, addressing your concerns about rewriting of the contract. For maintenance, the law does provide an exception to enforceability, and I remind the court that prior to enactment of the new act. Let me cut the chase here for a second. Why do you worry about maintenance when there's a provision in the anti-natural agreement that says you get some figure that is not less than $100,000 with no tampon? That's my point. Why do you even care about maintenance when you've got a provision like that in the agreement? This gets to my last point in my brief, which says that the court could have taken that into consideration and given her all of the marital assets, in this case, in order to create justice. We could have given her more than that. He could have awarded her cash sum that might have required sale of some other property, but it doesn't mean he can't award a cash amount that would require him to sell some of that property. I agree wholeheartedly, and I think the court should have done that, particularly in light of the circumstances of this case, which reflect uncontradictively that Diane was taken advantage of through Bob and his people, who told her that she should trust. We've got this. We're taking care of this. Don't worry, dear. We'll be okay. You'll be okay. We're all going to be okay. Well, we found out it's not true. We found out after the fact that Bob has 30 times okay to Diane's okay. And it's not right what's happening in this case, and I think you're right. The court could have very easily crafted an award that gave Diane, amongst other things, the marital assets that he declared to be marital and possibly other cash awards to equalize. And that is unfortunately not the case, and what has happened in this case is a travesty under the circumstances. Getting to the Burgess decision, I don't read the case the same way. I think neither did the judge. The bottom line is Burgess is there to prevent injustice. You're right. Peonary is just an example. Other things were considered by this court, and I think correctly considered by Judge Darrow, in not enforcing the maintenance provision. What happened in this case, the totality of the circumstances in this case, would be sickening to enforce that provision of the premarital agreement. That kind of gets to you. But it's Burgess from our court. It is, and it gave the court the power to correct a wrong. And in this case, the court identified numerous reasons why what happened to Diane was wrong. The court identified numerous reasons why he didn't want to do this. Never mind the court. Yes, he is kind of rewriting it. But the bottom line is premarital agreements before enactment of the new law were disfavored. Enforcement of them were disfavored. And you look at a 30-year marriage, you look at the fact that they never talked about it again, you look at the fact that for 10 straight years they met with attorneys, retirement planners, et cetera, et cetera. It was never discussed. And even Bob said his eyes opened when it fell out of the attorney's files. He hadn't thought it was around anymore. Even Bob, an astute businessman, didn't think it was around. He didn't even plead it as an affirmative defense in his pleadings until it fell out of the attorney's file. And he was surprised that his eyes opened wide. Counsel, that's one minute. I suggested to the court that since Bob hadn't even mentioned it to this attorney that's representing him now, because if he had, it would have been pled as an affirmative defense. The fact that it didn't even get discussed until it fell out of the attorney's file would indicate that nobody considered this thing enforceable anymore. They acted totally contrary to its enforceability. Diane was never advised by anybody about making sure that she had assets in her own name, too. But she didn't need to. Why would she be concerned about it? As far as she was concerned, and this is why she destroyed it and threw it away when she transferred the assets over to the new safety deposit box. Why keep it around? It's not enforceable anymore. Five years was five years. If you look at the contract, the criminal agreement was easily manipulated after the fact, and I think that's what's happened in this case. The bottom line is Diane was the only person who was absolutely certain in her testimony about the facts related to the execution of that document. Bob's testimony was vague and clusery at best. I'm asking the court to please do what's right. Please help this woman. She's had enough wrong things happen to her so far already. Thank you. Thank you, Mr. Neffel. Mr. Pugliatelli? The last five minutes. I'm not going to read all that. Oh, I'm sorry. There are a couple of things I wish to point out. First of all, that 30 times wasn't acquired during the marriage. It was had at the time he came into the marriage. That was the IRA, which he didn't touch, which he continued to grow. No marital assets, no assets, except for $10 went into that during the marriage. So it wasn't acquired during the marriage. It was already existing. Secondly, to say there's not once until evidence to back up counsel's statements that that money will not be repaid. In fact, the evidence shows that Bob did repay certain amounts of money that were borrowed because he had to repay them. And in fact, there's an obligation to do so, a fiduciary obligation, that can be enforced by those people who are affected. And do we believe that Diane isn't going to try to enforce that fiduciary obligation? Do we believe that her daughters are not going to, though adopted by Bob, are not going to enforce that fiduciary obligation? Bob's children are not going to enforce it? To speculate and to say that that's the fact is to confuse speculation with the fact and the reality of what those loans are. Now, here's what the provision contains in the separation agreement for Maine. It says,  shall be entered in the proceeding between them. Each party shall retain any property owned by him or her at the time of the marriage and his or her proportional share of any property acquired by the parties after the marriage and held or owned by them as tenants in common, tenants in the entirety and joint tenants, in beneficial interest of any trust after the marriage. It says, as and for equitable lump sum settlement in lieu of all rights of alimony, maintenance, support, dollar, community interest, homesteading. It goes on and on. That wife might have, by reason of marital relationship, under any present or future law of which she might have or be entitled to by any claim. Provided, however, this $100,000, some may be paid to wife shall first be reduced by the following. The fair market value of any property acquired by wife after the marriage and held and owned by her separately and the fair market value of the wife's proportional share of any properties acquired after the marriage and held by the parties as tenants in common, joint tenants, tenants by the entirety, and the fair market value of wife's beneficial interest in any trust if beneficial interest is acquired during the marriage. So that $100,000 actually gets reduced. So there is a limit of $100,000. Now, Bob saw to it that $500,000 was put in Diane's name and that's her property. He's not making a claim to it. He's further stating that the properties that were jointly held don't get eroded. So Diane ends up with really a very handsome settlement in terms of what the agreement provides. She's not canary. She has a million dollars in cash because Bob has to buy her out to CHEO Act and she can elect to keep the property which she has in Rock Island. So she has a $600,000 home. No liens, no debts. Bob has all the debts of $400,000 and he has then $507,000 that he used to buy her out. I suggest to you that Burgess and his progeny, that this is not a condition where the maintenance award ought to be given. She's been treated fairly under the agreement. She's a millionaire. She doesn't have to work. The whole idea of a prenuptial agreement, is that it be fair, that she's not a left canary, that there are economic circumstances in which to change her position, and there aren't any. And this is what I'd suggest to the court, a very fair disposition, because a lot of what is there in marital assets, in the joint tenancy assets, came directly from Bob's payment from his prior IRA. Did you ever see a case where they're litigating a prenup after 31 years of marriage? Yes, I think there are some cases that we cite that are extensive, that it's been a long time. And obviously things can happen in 31 years. You can have good things happen, like happen here, and she's left with a million and a half. And Bob, really, with the assets that were acquired during the marriage, he's left with very little. He has his premarital, but that's about all he has. He doesn't have assets that are acquired, because of the $1,000,000... First of all, at the same time he put $500,000 in Diane's name, he didn't put $500,000 in his name. And so then we have the $2.2 million in marital assets, joint tenancy properties. Diane gets half of that, and none of the debts. So Bob may get a million and one, but that's reduced down to $726,000, because he's got to pay the debts. And then we look at the $320,000 he put in in 2009, when Diane filed for divorce, that came directly from his premarital asset. That further reduces what he's getting, because he actually is financing $320,000 in joint property. And then we look at the $220,000 he put in from his trust into one of the other joint assets. So that's about... He starts off with 40%, and then he really has less that he gets as far as assets for the marriage, because he's actually put that money in from his IRA, which is non-marital. Thank you. Any questions? Any questions? No. That looks like it. We'd like to thank both of you for your arguments this morning. We'll take the matter under advisement, and we'll issue a written decision as quickly as possible. The court will stand in brief recess for a point of change.